Michael R. Lozeau (State Bar No. 142893)
Richard T. Drury (State Bar No. 163559)
Rebecca L. Davis (State Bar No. 271662)
LOZEAU DRURY LLP
410 12th Street, Suite 250
Oakland, CA 94607
Tel: (510) 836-4200
Fax: (510) 836-4205 (fax)
E-mail: michael@lozeaudrury.com
        richard@lozeaudrury.com
        rebecca@lozeaudrury.com

Attorneys for Plaintiff
CALIFORNIA COMMUNITIES
AGAINST TOXICS

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA COMMUNITIES AGAINST TOXICS, an unincorporated non-profit association, <br><br> Plaintiff, <br><br> vs. <br><br> WEBER METALS, INC., a California corporation, <br><br> Defendant. | Case No.  2:15-cv-00148-PA-AGR <br><br> **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S FIRST, SECOND AND THIRD CAUSES OF ACTION AND MOTION TO STRIKE SPECIFIED ALLEGATIONS IN THE COMPLAINT** <br><br> Date:  May 4, 2015 <br> Time:  1:30 p.m. <br> Courtroom:  15 <br> Judge:  Hon. Percy Anderson |

# **TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................1

II.     FACTUAL AND PROCEDURAL BACKGROUND ................................2

III.    LEGAL BACKGROUND ......................................................................2

        A.      Clean Water Act ...................................................................2

        B.      California's General Industrial Storm Water Permit ....................3

        C.      The Clean Water Act's Citizen Suit Notice Requirement .............4

IV.     STANDARDS OF REVIEW ..................................................................6

        A.      Standard Governing Dismissal Under Rule 12(b)(1).................6

        B.      Standard Governing Striking Allegations Under Rule 12(f) ........6

V.      ARGUMENT ......................................................................................7

        A.      Plaintiff's Notice Meets Each of the Requirements Set Forth in
                40 C.F.R. § 135.3(a) ...........................................................7

                1.      CCAT's notice includes sufficient information to permit
                        Weber to identify the activity alleged to constitute a violation
                        of the General Permit's BAT/BCT Requirement Alleged
                        in the First Cause of Action ........................................8

                2.      CCAT's notice includes sufficient information to permit
                        Weber to identify the activity alleged to constitute a violation
                        of the General Permit's requirement that Weber's discharges
                        neither cause nor contribute to violations of water quality
                        standards ...............................................................13

                3.      CCAT's notice includes sufficient information to permit
                        Weber to identify the activity alleged to constitute a violation
                        of the General Permit's SWPPP requirements ................20

B.  Weber's Argument that Factual Allegations in the Complaint
Should be Stricken Because they were not Mimiced in the Notice
is Incorrect Because Plaintiff's Notice is Sufficient ...................................21

V.  CONCLUSION ..........................................................................................23

## **TABLE OF AUTHORITIES**

### **CASES**

*Albizo v. Wachovia Mortg.,*
   2012 U.S. Dist. LEXIS 55985 (E.D. Cal. Apr. 19, 2012) ................................ 6

*Baykeeper v. Int'l Metals Ekco, Ltd.,*
   619 F.Supp.2d 936 (C.D. Cal. 2009) .......................... 3, 4, 15, 17, 19

*Baykeeper v. Kramer Metals, Inc.,*
   619 F.Supp.2d 914 (C.D. Cal. 2009) .......................... 3, 4, 15, 18, 19

*Cal. Sportfishing Prot. Alliance v. All Star Auto Wrecking, Inc.,*
   860 F.Supp.2d 1144 (E.D. Cal. 2012) ................................ 3

*Cal. Sportfishing Prot. Alliance v. Callaway,*
   2012 U.S. Dist. LEXIS 169072 (E.D. Cal. 2012) ........................ 18

*Cal. Sportfishing Prot. Alliance v. Diablo Grande, Inc.,*
   209 F.Supp.2d 1059 (E.D. Cal. 2002) ................................ 10

*Ctr. for Biological Diversity v. Marina Point Dev. Co.,*
   560 F.3d 903 (9th Cir. 2009) ................................ 5

*Chaganti v. i2 Phone Int'l, Inc.,*
   635 F. Supp. 2d 1065 (N.D. Cal. 2007) ................................ 6

*Coalition for a Sustainable Delta v. City of Stockton,*
   2009 U.S. Dist. LEXIS 74353 (E.D. Cal. Aug. 20, 2009) ...................... 13

*Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy*
   305 F.3d 943 (9th Cir. 2002) ................................ 4, 5, 10

*Defenders of Wildlife v. Browner,*
   191 F.3d 1159 (9th Cir. 1999) ................................ 17

*Ecological Rights Found. v. Pac. Gas & Elec. Co.,*
   713 F.3d 502 (9th Cir. 2013) ................................ 5, 18

*Ecological Rights Foundation v. Sierra Pacific Industries,*
  slip op. No. C-01-0520 MEJ (N.D. Cal. 2002) ............................................................. 18

*Envtl. Prot. Info. Ctr. v. Pac. Lumber Co.,*
  301 F.Supp.2d 1102 (N.D. Cal. 2004).......................................................................... 3

*Fantasy, Inc. v. Fogerty,*
  984 F.2d 1524 (9th Cir. 1993) ..................................................................................... 7

*Friends of Frederick Seig Grove 94 v. Sonoma County Water Agency,*
  124 F.Supp.2d 1161 (N.D. Cal. 2000)........................................................................ 13

*Hallstrom v. Tillamook County,*
  493 U.S. 20 (1989) ....................................................................................................... 5

*Hawaii's Thousand Friends v. City and County of Honolulu,*
  821 F. Supp. 1368 (D. Ha. 1993) .............................................................................. 19

*Lazar v. Trans Union LLC,*
  2000 U.S. Dist. LEXIS 10237 (CD Cal. 2000) ............................................................ 7

*Martin Ray Winery v. Graham,*
  2007 U.S. Dist. LEXIS 22858 (N.D. Cal. Mar. 28, 2007) ........................................... 6

*Mophie Inc. v. Loza & Loza LLP,*
  2011 U.S. Dist. LEXIS 82047 (C.D. Cal. July 25, 2011) ......................................... 6, 7

*NRDC v. County of L.A.,*
  725 F.3d 1194 (9th Cir. 2013) ......................................................................... 12, 15, 16

*NRDC v. Southwest Marine,*
  236 F.3d 985 (9th Cir. 2000) ....................................................................................... 5

*NRDC v. Southwest Marine,*
  945 F.Supp. 1330 (S.D. Cal. 1996) ............................................................................ 21

*ONRC Action v. Columbia Plywood, Inc.,*
  286 F.3d 1137 (9th Cir. 2002) ..................................................................................... 5

*Puget Soundkeeper Alliance v. Tacoma Metals, Inc.*,
   2008 U.S. Dist. LEXIS 60741 (W.D. Wash. Aug. 5, 2008) ......................................... 19

*Roberts v. Corrothers*,
   812 F.2d 1173 (9th Cir. 1987) ...................................................................... 6

*San Francisco Baykeeper v. Levin Enterprises, Inc.*,
   2013 U.S. Dist. LEXIS 178501 (N.D. Cal. 2013) ...........................................3, 12-13, 21

*San Francisco Baykeeper, Inc. v. Tosco Corp.*,
   309 F.3d 1153 (9th Cir. 2002) ............................................................. 5, 10, 22

*San Francisco Baykeeper v. Town of Hillsborough*,
   2008 U.S. Dist. LEXIS 101989 (N.D. Cal. Dec. 5, 2008) ......................................... 10

*San Francisco Baykeeper v. W. Bay Sanitary Dist.*,
   791 F.Supp.2d 719 (N.D. Cal. 2011) .......................................................... 9

*Santa Monica BayKeeper v. SunLite Salvage*,
   slip op., Case No. Civ.99-4578 WDK (C.D. Cal. 1999) .................................... 18

*Shinde v. Nithyananda Found.*,
   2013 U.S. Dist. LEXIS 70002 (C.D. Cal. 2013) ......................................... 6

*Sierra Club Ohio Chapter v. City of Columbus*,
   282 F.Supp.2d 756 (S.D. Ohio 2003) ...................................................... 21

*Washington Trout v. McCain Foods, Inc.*, 45 F.3d 1351 (9th Cir. 1995) .................... 5, 13

*Waterkeeper Alliance, Inc. v. United States EPA*,
   399 F.3d 486 (2d Cir. 2005) ..................................................................... 8

*Waterkeepers N. Cal. v. AG Indus. Mfg.*,
   2005 U.S. Dist. LEXIS 43006 (E.D. Cal. Aug. 19, 2005) ................. 4, 15, 19, 20, 21, 22

*WaterKeepers N. Cal. v. AG Indus. Mfg.*,
   375 F.3d 913 (9th Cir. 2004) .................................................5, 10, 14, 16, 17, 21, 22

*Wishtoyo Found. v. Magic Mt. LLC*,
   2014 U.S. Dist. LEXIS 168311 (C.D. Cal. Dec. 3, 2014) ............................. 19

# STATUTES

**Clean Water Act, 33 U.S.C.**
§ 1311 ..................................................................................................... 15, 16
§ 1311(a) ..................................................................................................... 3, 19
§ 1311(b)(1)(C) ......................................................................................... 15, 16
§ 1342 ......................................................................................................... 3, 5
§ 1342(a)(2) ................................................................................................. 12
§ 1342(k) ..................................................................................................... 3, 19
§ 1342(p)(A) ............................................................................................... 15
§ 1342(p)(2)(B) ........................................................................................... 3
§ 1342(p)(3)(A) ........................................................................................... 16
§ 1365 ......................................................................................................... 2
§ 1365(a) ..................................................................................................... 6
§ 1365(b) ..................................................................................................... 4
§ 1365(b)(1)(A) ........................................................................................... 15

**Code of Federal Regulations, 40 C.F.R.**
§ 122.44(i)(1) ............................................................................................... 12
§ 131.38 ....................................................................................................... 15
§ 135.3(a) ..................................................................................... 4, 6, 7, 9, 15

**Federal Rules of Civil Procedure**
§ 12(b)(1) ..................................................................................................... 1, 2, 6
§ 12(f) ......................................................................................................... 2, 6, 7

**Federal Register**
65 Fed. Reg. 31682 (May 18, 2000) ......................................................... 15, 16
65 Fed. Reg. 31701 (May 18, 2000) ......................................................... 19
65 Fed. Reg. 31703 (May 18, 2000) ......................................................... 15
65 Fed. Reg. 31752-31755 (May 18, 2000) ............................................. 19

## I.       INTRODUCTION

Plaintiff California Communities Against Toxics ("Plaintiff" or "CCAT") brings this citizen enforcement action under the federal Clean Water Act to address Defendant Weber Metals, Inc.'s ("Weber" or "Defendant") continuous and ongoing violations of California's General Industrial Storm Water Permit.  Defendant's own reporting and storm water monitoring demonstrate that its industrial facility is discharging polluted stormwater without first implementing the Best Available Technology Economically Achievable ("BAT") and the Best Conventional Pollutant Control Technology ("BCT") to reduce pollution to safe levels.  The company's reports also demonstrate that it is discharging pollutants at levels that cause or contribute to violations of water quality standards and that indicate it is operating with an inadequate Storm Water Pollution Prevention Plan ("SWPPP").  On April 17, 2014, CCAT notified Weber of each of these violations of the CWA and CCAT's intent to file this action to address the company's compliance shortcomings.  Weber has filed a motion to dismiss under Federal Rules of Civil Procedure (F.R.C.P.), Rule 12(b)(1) claiming the company could not understand the violations described in the notice letter.  Weber's arguments depend on misconstruing the Clean Water Act's notice requirements, misstating the contents of CCAT's notice, and, for the most part, asking the Court to consider the merits of the allegations rather than the sufficiency of the notice to state the alleged violations.

In addition, Weber's claim that allegations in Plaintiff's Complaint should be stricken that exceed the scope of the matters disclosed in its pre-litigation notice ignores the fact that the pre-litigation notice meets all of the statutory requirements promulgated by the Environmental Protection Agency ("EPA").  Nothing prohibits Plaintiff from providing additional factual background in its Complaint simply because those facts were not stated in the notice letter.  As long as the statutory requirements for providing notice are met, the Court has jurisdiction over the matter.

For each of the foregoing reasons, Plaintiff respectfully requests that the Court deny Weber's motion in its entirety.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

The case is a citizen suit enforcement action brought by Plaintiff CCAT under section 505 of the federal Clean Water Act ("CWA"), 33 U.S.C. § 1365.  Compl., ¶ 2.  On April 17, 2014, CCAT provided Defendant with a notice of its violations of the CWA, alleging that Defendant violated and continues to violate the terms of the General National Pollutant Discharge Elimination System ("NPDES") Permit for Storm Water Discharges from Industrial Activity ("General Permit") at Weber's industrial facility ("Facility") located in Paramount, California.  *Id*., ¶ 3; Def. Motion, Exhibit ("Ex.") 1 ("Notice").  *See* Declaration of Rebecca Davis in Support of Plaintiff's Opposition to Motion to Dismiss ("Davis Dec."), Ex. A (General Permit excerpts).  CCAT's notice triggered an extended discussion between the parties that is ongoing.  The parties entered into a confidentiality agreement and tolling agreement, extending the notice period to almost nine months, in order to facilitate the discussions.  Davis Dec., Exs. B & C.

On January 8, 2015, CCAT proceeded to file its Complaint against Weber.  The Complaint alleges, *inter alia*, that the Facility discharges storm water containing excessive levels of total suspended solids, oil and grease, zinc, copper, and other un-monitored pollutants into waters of the United States without applying the requisite BAT and BCT levels of pollution control (Compl., ¶¶ 54, 61-63), that cause or contribute to exceedances of water quality standards (*id.*, ¶¶ 66-70), and result from an inadequate or unimplemented Storm Water Pollution Prevention Plan ("SWPPP") and monitoring (*id.*, ¶¶ 73-76, 79-80).  On April 2, 2015, Weber filed a Motion to Dismiss and Motion to Strike pursuant to Rule 12(b)(1) and 12(f).

## III.   LEGAL BACKGROUND

### A.   Clean Water Act.

The CWA "establishes a comprehensive statutory system for controlling water

pollution," which is "[b]uilt on a fundamental premise that the unauthorized discharge of any pollutant by any person shall be unlawful." *Envtl. Prot. Info. Ctr. v. Pac. Lumber Co.*, 301 F.Supp.2d 1102, 1105 (N.D. Cal. 2004) ("*EPIC*").  To this end, CWA section 301(a) prohibits the discharge of any pollutant into waters of the United States unless the discharge is in compliance with the terms of an NPDES permit issued pursuant to CWA section 402.  CWA § 301(a), 33 U.S.C. § 1311(a); CWA § 402, 33 U.S.C. § 1342; *EPIC*, 301 F.Supp.2d at 1105.  Section 301(a)'s prohibition applies equally to industrial facility's discharge of storm water associated with their activities.  CWA § 402(p)(2)(B), 33 U.S.C. § 1342(p)(2)(B); *see Cal. Sportfishing Prot. Alliance v. All Star Auto Wrecking, Inc.*, 860 F.Supp.2d 1144, 1153 (E.D. Cal. 2012); *Baykeeper v. Kramer Metals, Inc.*, 619 F.Supp.2d 914, 919 (C.D. Cal. 2009); *Baykeeper v. Int'l Metals Ekco, Ltd.*, 619 F.Supp.2d 936, 940 (C.D. Cal. 2009).  To establish a violation of the CWA, a plaintiff need only prove that the defendant violated the terms and conditions of its NPDES permit.  33 U.S.C. §§1311(a), 1342(k).

### B.   California's General Industrial Storm Water Permit.

In California, the State Board has issued a single, statewide General Permit applicable to all storm water discharges associated with industrial activity.[1]  In order to discharge storm water lawfully in California, industrial permittees must comply with the terms of the General Permit.

Among numerous requirements, the General Permit mandates that permittees reduce or prevent polluted storm water discharges by implementing best management practices ("BMPs") that meet BAT for toxic and non-conventional pollutants and BCT for conventional pollutants.  Davis Dec., Ex. A., p. 4 (Effluent Limitation B(3)).  The General Permit includes provisions to protect receiving waters as well, most notably a requirement

---

[1] "The State Water Board is a delegated agency and is authorized to issue, implement, and enforce NPDES permits."  *San Francisco Baykeeper v. Levin Enterprises, Inc.*, 2013 U.S. Dist. LEXIS 178501, 4 (N.D. Cal. 2013).

that storm water discharges associated with industrial activity not cause or contribute to an exceedance of water quality standards.  *Id.* (Receiving Limitation C(2)).  Such standards include numeric criterion adopted by the federal Environmental Protection Agency for all California's waters known as the California Toxics Rule ("CTR").  *Kramer Metals, Inc.*, 619 F.Supp.2d at 926;  *Int'l Metals Ekco, Ltd.*, 619 F.Supp.2d at 948;  *Waterkeepers N. Cal. v. AG Indus. Mfg.*, 2005 U.S. Dist. LEXIS 43006, 6 (E.D. Cal. Aug. 19, 2005).  The General Permit also requires that permittees develop and implement a Storm Water Pollution Prevention Plan.  Davis Dec., Ex. A, pp. 11-23 (Section A).  The SWPPP is required to establish a scheme to comply with various discharge prohibitions, effluent limitations, and receiving water limitations through the development and implementation of BMPs that must be sufficient to achieve the BAT and BCT treatment standards.  *Id.*

### C. The Clean Water Act's Citizen Suit Notice Requirement.

A citizen plaintiff may file an enforcement action under the CWA "sixty days after the plaintiff has given notice of the alleged violation to . . . any alleged violator…."  33 U.S.C. § 1365(b).  40 C.F.R. § 135.3(a) sets forth the criteria by which the adequacy of a notice of citizen suit is weighed:

> [n]otice regarding an alleged violation of an effluent standard or limitation or of an order with respect thereto, ***shall include sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation***, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice.

40 C.F.R. § 135.3(a) (emphasis added).  "The key language in the notice regulation is the phrase 'sufficient information to permit the recipient to identify' the alleged violations and bring itself into compliance."  *Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy* ("*CARE*"), 305 F.3d 943, 951 (9th Cir. 2002).  "[A]s long as a notice letter is reasonably specific as to the nature and time of the alleged violations, the plaintiff has

fulfilled the notice requirement." *Ecological Rights Found. v. Pac. Gas & Elec. Co.*, 713 F.3d 502, 519 (9th Cir. 2013). "The letter does not need to describe every detail of every violation; it need only provide enough information that ***the defendant*** can identify and correct the problem." *Id.* (emphasis added); *San Francisco Baykeeper, Inc. v. Tosco Corp.*, 309 F.3d 1153, 1155 (9th Cir. 2002); *see also CARE*, 305 F.3d at 951 (notice does not require "exhaustive list of all violations"). As the Ninth Circuit explains:

> Although the notice must be sufficiently adequate so that the recipients can identify the basis for the complaint, "the citizen is not required to list every specific aspect or detail of every alleged violation. Nor is the citizen required to describe every ramification of a violation."

*CARE*, 305 F.3d at 951. "Subject matter jurisdiction is established by providing a notice that is adequate on the date it is given to the defendant." *NRDC v. Southwest Marine*, 236 F.3d 985, 997 (9th Cir. 2000).

The Ninth Circuit and other courts have ruled that compliance with the notice requirements must be strictly construed. *Id.* at 998. Most of the notable cases have applied the strict construction admonishment where a notice completely omits an entire category of information required by Section 135.3(a). *See, e.g., Ctr. for Biological Diversity v. Marina Point Dev. Co.*, 560 F.3d 903, 913 (9th Cir. 2009) (notice of violations of 33 U.S.C. § 1342 insufficient where provision not mentioned at all); *ONRC Action v. Columbia Plywood, Inc.*, 286 F.3d 1137, 1143 (9th Cir. 2002) (60-day notice identifying one issue of timeliness of permit renewal application did not provide notice of other potential claims that were not included); *Washington Trout v. McCain Foods, Inc.*, 45 F.3d 1351, 1354 (9th Cir. 1995) (notice did not identify plaintiffs); *Hallstrom v. Tillamook County*, 493 U.S. 20, 26 (1989) (notice not sent to EPA and state agency). However, strict construction of the regulation's requirements not only requires addressing each of the categories of information set forth in the regulation, it also precludes any broad readings of the regulation that attempt to add requirements that are not there or otherwise expand the requirements beyond their express terms. *See CARE*, 305 F.3d at 951; *see also WaterKeepers N. Cal. v. AG Indus. Mfg.*, 375

F.3d 913, 917 (9th Cir. 2004) ("Although the Act's notice requirement is 'strictly construed,' [] plaintiffs are not required to 'list every specific aspect or detail of every alleged violation.'").  Neither 33 U.S.C. § 1365(a), nor 40 C.F.R. § 135.3(a) requires a citizen plaintiff to identify the root cause of an alleged violation in its notice letter.  Nor do those provisions require a citizen plaintiff to identify how a defendant would or should choose to cure any violations.

## IV.   STANDARDS OF REVIEW.

### A. Standard Governing Dismissal Under Rule 12(b)(1).

While a plaintiff bears the burden of establishing jurisdiction when a defendant brings a motion pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, a plaintiff is "entitled to the speculative benefit of any facts he might conceivably prove in support of his well pleaded allegations."  *Chaganti v. i2 Phone Int'l, Inc.*, 635 F. Supp. 2d 1065, 1075 (N.D. Cal. 2007).  A plaintiff defeats a Rule 12(b)(1) motion "by showing any arguable basis in law for the claim made."  *Martin Ray Winery v. Graham*, 2007 U.S. Dist. LEXIS 22858 (N.D. Cal. Mar. 28, 2007).  The court should not resolve disputed facts in a Rule 12(b)(1) motion, unless the moving papers establish that there are no material facts in dispute.  *Roberts v. Corrothers,* 812 F.2d 1173, 1177 (9th Cir. 1987).

### B.   Standard Governing Striking Allegations Under Rule 12(f).

The moving party bears the burden on a Rule 12(f) motion to strike and "the standard for granting such a motion is high."  *Albizo v. Wachovia Mortg.*, 2012 U.S. Dist. LEXIS 55985, 59-60 (E.D. Cal. Apr. 19, 2012).  Motions to strike are viewed with disfavor and are infrequently granted.  *Shinde v. Nithyananda Found.*, 2013 U.S. Dist. LEXIS 70002, 7 (C.D. Cal. 2013).  A motion to strike on grounds of impertinence and immateriality should be denied unless it can be shown that no evidence in support of allegation would be admissible.  Immaterial matter as "that which has no essential or important relationship to the claim for relief or the defenses being pleaded." *Mophie Inc. v. Loza & Loza LLP*, 2011 U.S. Dist. LEXIS 82047, 4-5 (C.D. Cal. July 25, 2011), quoting

*Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993), rev'd on other grounds, 510 U.S. 517 (1994).  "[I]mpertinent" refers to allegations that are not responsive or relevant to the issues involved in the action and which could not be admitted as evidence in the action."  *Id*. at 6.  To succeed on a Rule 12(f) motion to strike, a defendant must demonstrate that allegations have no bearing on issues in the case and that to permit allegations to stand would result in prejudice to defendant.  *Lazar v. Trans Union LLC*, 2000 U.S. Dist. LEXIS 10237, 10 (CD Cal. 2000).  "In considering a motion to strike, the court views the pleadings in the light most favorable to the non-moving party and resolves any doubt as to the relevance of the challenged allegations in favor of the plaintiff."  *Mophie Inc.*, 2011 U.S. Dist. LEXIS 82047, 6.

## V.   ARGUMENT

### A.   Plaintiff's Notice Meets Each of the Requirements Set forth in 40 C.F.R. § 135.3(a).

The principal flaw in Weber's arguments is its inappropriate effort to amend EPA's notice regulation to include two requirements that are not there.   First, Weber argues that a notice must "provide[] specific details about the activities alleged to ***cause*** the violation."  Weber Br., p. 5 (emphasis added); *see also id*., p. 8.  Section 135.3(a) does not require a notice sender to understand in advance of sending the notice the ***cause*** of a violation.  Section 135.3(a) instead requires the notice to provide sufficient information for the recipient to identify "the activity alleged to ***constitute*** a violation."

Second, Weber argues that Section 135.3(a) requires that a notice provide "suggested corrective actions" to the recipient.  Weber Br., p. 7; *see also id*., p. 8 ("CCAT's Notice should have provided an overview of Weber's BMPs … suggesting measures that would achieve BAT/BCT").  No such requirement appears in Section 135.3(a).  Although the notice letter and requisite 60-day waiting period to file litigation serves the dual purposes of allowing the State or federal agencies to step in and file an enforcement action should they choose to do so and to provide the notice recipient an

opportunity to comply if possible with the identified violations, it is up to the recipient during that 60-day notice period to determine what actions they consider necessary to achieve the identified standards and limitations.  Section 135.3(a) does not place this role on the citizen who, during the notice period, has probably not yet been allowed access to the site or non-public facility information where the violations are occurring.

1. **CCAT's notice includes sufficient information to permit Weber to identify the activity alleged to constitute a violation of the General Permit's BAT/BCT Requirement Alleged in the First Cause of Action.**

CCAT's notice has more than sufficient information for Weber to have identified the activities constituting the violations alleged in the First Cause of Action – Weber's discharges of stormwater associated with industrial activity that have not been subjected to BAT or, in the case of certain parameters, BCT.  Complaint, ¶¶ 60-63.  Those untreated or inadequately treated discharges of stormwater are the activities constituting the violations alleged in the First Cause of Action.  *See Waterkeeper Alliance, Inc. v. United States EPA*, 399 F.3d 486, 504 (2d Cir. 2005) ("unless there is a 'discharge of any pollutant,' there is no violation of the Act…").

Weber does not dispute that the notice identifies Weber's facility at 16706 Garfield Avenue in Paramount, California.  Notice, p. 1.  The notice identifies the specific pollutant parameters that are being discharged in storm water from the facility.  *Id*., p. 5.  The Notice identifies from which outfall or drain at the facility the pollutant levels were measured.  *Id*., pp. 5-9.  The Notice specifies the levels of these pollutants being discharged.  *Id*.  It explains that the pollutant levels measured by Weber are "evidence of ongoing violations of Effluent Limitation B(3) of the General Industrial Storm Water Permit."  *Id*., pp. 5, 8.  The Notice also explains, "Effluent Limitation B(3) … requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants."  *Id*., p. 4.   The Notice then alleges that the polluted storm water discharges constituting the BAT/BCT

violations have occurred and will continue to occur on every rain event that occurs at the facility, listing specific dates of samples and rain events. *Id.*, p.10.

This is more than sufficient information for Weber to be able to work its way back from these discharges to the locations within its own facility that might be contributing the pollutants in the storm water discharges, to evaluate whether any management measures are in place, and to determine what additional measures and equipment may be necessary to apply BAT/BCT to the identified discharge and pollutants. The detailed level of specificity included in CCAT's notice is sufficient "to give the accused company the opportunity to correct the problem." *San Francisco Baykeeper v. W. Bay Sanitary Dist.*, 791 F.Supp.2d 719, 753 (N.D. Cal. 2011).

Indeed, the information that Weber claims CCAT should have described and analyzed in the notice is information solely in the possession of Weber. Weber's facility is not open to the public. Only small portions of the facility may be viewed from adjacent public rights-of-way. During the 60-day notice period, in order for CCAT to be allowed on site to conduct an inspection for settlement purposes, Weber required CCAT to sign a confidentiality agreement. Davis Dec., Ex. B. Similarly, Weber's current SWPPP was not available in the RWQCB's files. Although Weber is correct that the General Permit labels the SWPPPs as public documents, the Permit does not require permit holders to provide SWPPPs to the Regional Board. Davis Dec., Ex. A, General Permit, p. 22, Section A(10)(a) (SWPPP General Requirements). Weber only agreed to provide the SWPPP subject to the parties' confidentiality agreement. Davis Dec., ¶ 5. As a result, prior to sending the Notice and initiating settlement discussions or a legal action against Weber, it was impossible for CCAT to conduct what would amount to an audit of Weber's facilities, have the access necessary to identify pollution sources internal to the property, or observe what, if any, management practices are in place. The Ninth Circuit has addressed this specific constraint and its connection to Section 135.3's focus on the alleged violator's role to determine possible causes and corrections:

As a practical matter, BayKeeper did not have access to Tosco's complete records, and Tosco was "obviously in a better position than BayKeeper" to identify the dates of its own ship loading. [*San Francisco BayKeeper*, 309 F.3d] at 1158. The same is true here. AG Industrial is in a much better position to know when it periodically washes down areas of its facility, and WaterKeepers' letter provided sufficient information to permit AG Industrial to identify the nature and dates of the alleged violations.

*AG Indus. Mfg.*, 375 F.3d at 919-920; *see also Tosco Corp.*, 309 F.3d at 1158-1159 ("Given the knowledge that Tosco already had, BayKeeper's letter was specific enough to notify Tosco of the nature of the alleged violations, as well as the likely dates of those violations"); *San Francisco Baykeeper v. Town of Hillsborough*, 2008 U.S. Dist. LEXIS 101989, 10-11 (N.D. Cal. Dec. 5, 2008) ("defendant is in the best position to know the contents of its self-prepared reports"); *CARE*, 305 F.3d at 953 (explaining that Congress did not intend, in enacting the notice requirement, "to unduly burden citizens by requiring them to basically carry out the job of the [environmental enforcement] agenc[ies]"). Weber likewise has a monopoly on site-specific information at its facility. It's argument that CCAT had to include in effect a pollution audit of its facility asks CCAT to perform the impossible, something that is not required by Section 135.3(a).[2]

Weber is on record with the Regional Board indicating that a notice considerably vaguer than CCAT's was sufficient to notify the company of deficiencies in its BMPs

---

[2]     Only one of the two cases cited by Weber as making a passing reference to notices that included suggestions of how a discharger could comply with identified requirements actually does so. Weber Br., p. 6. However, that case did not hold that suggesting remediation in the notice letter was required by 40 C.F.R. § 135.3(a). *AG Indus. Mfg.*, 375 F.3d at 918 ("The letter also describes remedial steps AG Industrial could take"). As for *Cal. Sportfishing Prot. Alliance v. Diablo Grande, Inc.*, 209 F.Supp.2d 1059 (E.D. Cal. 2002), suggested remedies were not included in the notice nor did the court rule such remedies were required to be identified. *Id.* at 1068-1070. Nor did the court agree with defendant's argument that causes of violations should be spelled out. *Id.* at 1069. The District Court upheld the notice letter which included much less detail than CCAT's notice to Weber. *Id*.

and its compliance with the Permit's BAT/BCT requirement.  On August 17, 2010, the Regional Board sent Weber a letter disclosing the results of the Regional Board's review of Weber's 2009-2010 Annual Report and comparison of Weber's monitoring result's to the EPA's Benchmark Values.  Davis Dec., Ex. D.  The Regional Board notified Weber that specific parameters exceeded EPA's benchmark levels.  *Id*.  The Regional Board explained that, "[e]xceeding benchmark levels in sampling results is mainly due to ineffective BMPs" and the Permit "describes storm water BMPs and requires the permittee to develop and implement the BMPs to reduce or prevent pollutants in storm water discharges."  *Id*.  The Regional Board then directed Weber "to comply immediately with the following tasks:

> 1. Ensure full compliance with the General Permit (Section A.8).
> 2. Implement effective BMPs described in your SWPPP, or;
> 3. If you are already implementing the BMPs described in your SWPPP but your analytical results are higher than the benchmark values, you must implement additional BMPs, and amend your SWPPP accordingly.

*Id*., p. 2.  Weber's response indicates that the company had no problem discerning the meaning of the Regional Board's directive.  Indeed, Weber wrote back to the Board on September 16, 2010, stating that:

> [g]iven the current status of our investigation, it seems premature to evaluate best management practices (BMPs) and amend our Storm Water Pollution Prevention Plan (SWPPP) until analytical results are available and we have pinpointed the specific origin(s) of the contaminants.

Davis Dec., Ex. E.  Likewise, two years later, in response to another letter from the Regional Board, Weber again emphasized the need for it to do a site–specific analysis of BMPs:  "As mentioned before, we are currently evaluating these new additional … BMP's[] to address their practicality prior to possible implementation before the next storm season."  *Id*., Ex. F.  If, as Weber claims, inspections and water quality monitoring

of internal subareas of the facility,[3] accompanied by an evaluation of BMPs in place are necessary in order to determine BMPs that meet the General Permit's BAT/BCT requirement, Weber cannot claim it is realistic for CCAT to have conducted those investigations within the Weber facility prior to sending its notice or, indeed, prior to discovery in an ensuing lawsuit.

The General Permit requires specific monitoring and annual reports that are submitted to the Regional Board.  As the Ninth Circuit recently explained, "the Clean Water Act *requires* every NPDES permittee to monitor its discharges into the navigable waters of the United States in a manner *sufficient to determine whether it is in compliance with the relevant NPDES permit*."  *NRDC v. County of L.A.*, 725 F.3d 1194, 1207 (9th Cir. 2013) (emphasis added) (citing 33 U.S.C. § 1342(a)(2); 40 C.F.R. § 122.44(i)(1) ("[E]ach NPDES permit shall include conditions meeting the following . . . monitoring requirements . . . to assure compliance with permit limitations")).  "That is, an NPDES permit is unlawful if a permittee is not required to effectively monitor its permit compliance."  *County of L.A.*, 725 F.3d at 1207.  The Annual Reports submitted by Weber to the State and Regional Boards are the monitoring reports and information deemed by the State Board as necessary to determine whether a facility is complying with the General Permit's requirements, including its BAT/BCT mandate.  *See* Davis Dec., Ex. A, p. 35, B (Monitoring Program and Reporting Requirements).  CCAT's Notice provided ample information from Weber's annual reports, listing in detail the company's reported discharge monitoring results and locations.  That reported information is, by definition, sufficient to place Weber in a position to evaluate the identified excessive stormwater pollution and consider additional pollution control measures.  Weber's argument ignores the State Board's careful consideration in the permit of the reporting information necessary to determine compliance included in the General Permit.  *See Levin Enters.*, 12 F.Supp.3d

---

[3] CCAT does not concede that such monitoring is necessary to identify BAT/BCT.

at 1222-1223 ("When the plaintiff has gathered the information supporting its suit from the defendant's own submissions to the relevant state agencies and cites those submissions in the notice letter, the plaintiff has satisfied the notice requirement, and a district court possesses subject matter jurisdiction over the case") (quoting *Friends of Frederick Seig Grove 94 v. Sonoma County Water Agency*, 124 F.Supp.2d 1161, 1169 (N.D. Cal. 2000)).

The Eastern District of California has upheld the sufficiency of a notice letter identifying the same categories of information compiled by CCAT in the notice to Weber. *See Coalition for a Sustainable Delta v. City of Stockton*, 2009 U.S. Dist. LEXIS 74353, 7-9 (E.D. Cal. Aug. 20, 2009).   CCAT's notice includes all of the information outlined by the Court in *Coalition for a Sustainable Delta* and more and is likewise sufficient.

Lastly, it is important to point out the CCAT's notice achieved the two purposes envisioned by Congress.  In particular, the notice instigated an ongoing settlement discussion between Weber and CCAT.  Davis Dec., ¶ 3, *see id.*, Ex. B.  *See Washington Trout*, 45 F.3d at 1354 ("the purpose of giving a sixty-day notice is to allow the parties time to resolve their conflicts in a nonadversarial time period").  Indeed, CCAT delayed filing of a complaint in order to extend the non-litigation period to facilitate the parties' discussion.  *Id.*, Ex. C (Dec. 10, 2014 Tolling Agreement) ("the Parties have been participating in and intend to continue participating in settlement discussions regarding the resolution of CCAT's alleged Claims against Weber…").  Ultimately, not only did the notice allow for a 60-day period for non-litigation discussions, it extended the pre-litigation period to almost 9 months.  CCAT's notice of the BAT/BCT claims in the First Cause of Action was both sufficient and effective.

> **2. CCAT's notice includes sufficient information to permit Weber to identify the activity alleged to constitute a violation of the General Permit's requirement that Weber's discharges neither cause nor contribute to violations of water quality standards.**

In regard to CCAT's Second Cause of Action, Weber argues that because it would like to argue a different legal interpretation about which water quality standards might

apply to Weber's discharges, that difference of legal opinion means that Weber did not have "sufficient information to understand how its conduct caused a violation of Sections (A)(1), (C)(1), and (C)(2) of the General Permit."  Weber Br., p. 12.

First, Weber confuses the merits of the Second Cause of Action with the adequacy of CCAT's notice letter.  Although Weber may wish to make arguments that the California Toxics Rule and the adopted TMDL for the Los Angeles River are not "applicable water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan," that merits argument does not dispute that the notice plainly identifies the General Permit's Discharge Prohibition A(2) and Receiving Water Limitation C(1) and C(2).  Notice, p. 5.  The Notice further informs Weber that "[t]he General Permit does not authorize the application of any mixing zones for complying with Receiving Water Limitation C(2).  As a result, compliance with this provision is measured at the Facility's discharge monitoring locations."  *Id*.  Nor can Weber dispute that the Notice letter identifies each and every applicable water quality standard contained in the Basin Plan that are enforced by the General Permit's referenced Receiving Water Limitations and Discharge Prohibition.  *Id*., pp. 2-8.  The Notice then lists out all of the available data gathered by Weber which CCAT believes indicate discharges of polluted stormwater at levels in excess of the numeric and narrative water quality standards.  *Id*., pp. 5-9. Whether or not Weber agrees with CCAT's reading of the Regional Board's Basin Plan or the import of EPA's Benchmark Values, there is no reasonable argument that the notice does not provide sufficient information for Weber to understand CCAT's Second Cause of Action.

A motion seeking to challenge the sufficiency of a notice letter is not the proper method to argue the merits of the claim.  As the Ninth Circuit explains, "[r]egardless of whether WaterKeepers is able to prove each claimed discharge, its intent-to-sue letter put AG Industrial on notice as to the violations that WaterKeepers would allege in its complaint. The statute and regulation require no more."  *AG Indus. Mfg.*, 375 F.3d at 918;

*see also* 33 U.S.C. § 1365(b)(1)(A) (notice must be given of "alleged" violations); 40 C.F.R. § 135.3(a) (same).  "The point of the Act's notice requirement is not to prove violations, it is to inform the polluter 'about what it is doing wrong,' and to allow it an 'opportunity to correct the problem.'"  *Id.* at 920.

Moreover, Weber is mistaken that the California Toxics Rule and the sediment TMDL are not applicable water quality standards or that the EPA Benchmark Values are not relevant to the Second Cause of Action (or more accurately the First Cause of Action). The California Toxics Rule is obviously a water quality standard that is applicable to storm water discharges.  EPA stated so explicitly in its final rulemaking.  65 Fed. Reg. 31682, 31703 ( May 18, 2000) ("EPA has for a longtime maintained that CWA section 301(b)(1)(C)  applies to NPDES permits for discharges from municipal separate storm sewer systems");  *id.* ("industrial storm water discharges ''must comply strictly with State water quality standards''); *see* 33 U.S.C. § 1342(p)(A) ("Permits for discharges associated with industrial activity shall meet all applicable provision of this section and section 301 [33 USCS § 1311].").

Weber acknowledges that its argument that the CTR is not a water quality standard applicable to stormwater discharges has been roundly rejected by Judge Dean Pregerson in *Kramer Metals, Inc.*, 619 F.Supp.2d at 926 (discussing at length court's conclusion that "[t]he California Toxics Rule ("CTR"), 40 C.F.R. 131.38, is an applicable water quality standard".  Weber does not tell the Court that Judge Pregerson came to the same conclusion in *Int'l Metals Ekco, Ltd.*, 619 F.Supp.2d at 948.  Weber also overlooks *Waterkeepers N. Cal.*, 2005 U.S. Dist. LEXIS 43006, 6, which also unequivocally ruled that "[t]he California Toxics Rule ("CTR"), established effective May 18, 2000, sets forth water quality standards applicable to toxic pollutants such as lead, cadmium, copper and zinc in storm water discharges within the State of California."  Likewise, the Ninth Circuit has recognized that the CTR applies to storm water discharges.  *County of L.A.*, 725 F.3d at 1199 (Los Angeles municipal stormwater permit precludes causing or contributing to

1 violations of water quality standards including EPA's CTR); *see also AG Indus. Mfg.*, 375

2 F.3d at 919 (upholding sufficiency of notice alleging violations of California Toxics Rule).

3       Weber argues that because the State's Policy For Implementation of Toxics

4 Standards For Inland Surface Waters, Enclosed Bays, and Estuaries of California (the

5 "SIP") "does not apply to regulation of storm water discharges," EPA's toxic rule is

6 somehow erased from the suite of water quality standards applicable to California's waters.

7 *See* Weber Br., pp. 10-11; SIP, p. 3, n.1.  The SIP does not alter the CTR's status as a

8 water quality standard applicable to all of California's surface waters.  Nor could it, EPA

9 having assumed authority over California to establish the CTR.  65 Fed. Reg. 31682

10 (Weber RJN, Ex. 2).  Furthermore, the State Board explains in the SIP that there is no need

11 for the SIP to apply because the State Board already adopted the General Permit:  "The

12 SWRCB has also adopted two statewide general permits regulating the discharge of

13 pollutants contained in storm water from industrial and construction activities."  SIP, p.. 2,

14 n. 1 (Weber RJN, Ex. 3).   In other words, one looks to the General Permit for receiving

15 water limitations implementing the CTR and other water quality standards.  The General

16 Permit is clear:

17

18       Storm water discharges and authorized non-storm water discharges shall not
      cause or contribute to an exceedance of any applicable water quality standards

19       contained in a Statewide Water Quality Control Plan or the applicable Regional
      Water Board's Basin Plan.

20

21 General Permit, § C.1; *see also id.*, Fact Sheet, p. VIII ("NPDES Permits for storm water

22 discharges must … require control of pollutant discharges using … BAT … BCT to

23 prevent and reduce pollutants and any more stringent controls necessary to meet water

24 quality standards").  Indeed, the Clean Water Act itself mandates that industrial stormwater

25 discharges such as Weber's must comply with all applicable water quality standards,

26 including in California the California Toxics Rule.  33 U.S.C. § 1342(p)(3)(A) ("Permits

27 for discharges associated with industrial activity shall meet all applicable provisions of this

28 section and section 301");  33 U.S.C. § 1311(b)(1)(C) (by 1977, dischargers must meet

"any more stringent limitation … required to implement any applicable water quality standard"); *Defenders of Wildlife v. Browner*, 191 F.3d 1159, 1164-65 (9th Cir. 1999) (industrial discharges must comply strictly with water-quality standards). Thus, even assuming the merits of the Second Cause of Action bears on the sufficiency of CCAT's notice, Weber's argument that the CTR does not apply is incorrect.

In regard to the concentration-based waste load allocations ("WLAs") for zinc and copper established for the Los Angeles River's impairment by those pollutants, Weber argues that the Basin Plan left it to the Regional Board's discretion whether to incorporate the WLAs into the General Permit. Weber Br., p. 10. First, this argument again attempts to argue the merits rather than the sufficiency of CCAT's notice letter. Second, the discretion claimed by Weber is not evident from the Basin Plan. Instead, the Basin Plan states that "[a]fter January 11, 2011, interim waste load allocations *shall be translated into enforceable permit conditions*." Weber RJN, Ex. 1, Basin Plan, p. 7-159 (emphasis added); *see also id.* ("Until January 11, 2011, interim waste load allocations will not be interpreted as enforceable permit conditions). Weber cites to the Plan's provision allowing the Regional Board the opportunity to identify specific BMPs that it certifies will meet the *final WLAs* established in the TMDL. Weber Br., p. 10; Weber RJN, Ex. 1, Basin Plan, p. 7-159. The final WLAs do not go into effect until January 11, 2016. Weber RJN, Ex. 1, Basin Plan, p. 7-159. However, CCAT's notice only references the interim concentration-based WLAs currently in effect. Thus, again, Weber does not make an argument showing how the notice could have been deficient and is wrong about the terms of the Basin Plan.

Lastly, Weber argues that because the EPA benchmark values are not referenced in the General Permit, Weber cannot understand how the benchmarks relate to the facility's alleged contribution to violations of water quality standards. Weber Br., p. 10. The relevance of EPA's benchmark values has been unanimously confirmed by every court that has addressed arguments similar to Weber's. *See, e.g.*, *Int'l Metals Ekco*, 619 F.Supp.2d at 945; *AG Indus. Mfg.*, 375 F.3d 913, 919 n.5 (9th Cir. 2004) (suggesting that the plaintiff

appropriately pointed to EPA benchmark values "as evidence to support its claim that [the defendant] failed to implement adequate BMPs"); *Kramer Metals*, 619 F.Supp.2d at 924-925.[4]  Weber's professed lack of understanding does not withstand even slight scrutiny given that the Notice expressly cites the benchmarks and that comparing Weber's pollution levels to those values is evidence of both violations of General Permit Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) and are evidence of ongoing violations of Effluent Limitation B(3) of the General Industrial Storm Water Permit.  *See* Notice, pp. 4-10.  Although Weber may not agree with the alleged violations, there can be no reasonable argument that it does not understand the claims in the notice letter.  Indeed, in both 2010 and 2012 the Regional Board employed the same benchmarks as CCAT to identify noncompliance by Weber with the General Permit.  *Supra,* pp. 10-11;  Davis Dec., Exs. D, F.  In response to those even more truncated notices, Weber had no trouble understanding the relevance of the benchmark exceedances to the General Permit's requirements and fashioning a response to the Regional Board.

Lastly, Weber argues that the notice is deficient because it suggests that the General Permit's receiving water limits, especially the provision prohibiting a facility from discharging polluted stormwater that causes or contributes a violation of a water quality standard, cannot be construed as a numeric limitation subject to strict liability.  Weber Br., pp. 11-12.  Again, Weber is confusing the merits of the Second Cause of Action with the sufficiency of CCAT's notice.

Moreover, there is no support for Weber's contention that the company is not strictly

---

[4] *See also Cal. Sportfishing Prot. Alliance v. Callaway*, 2012 U.S. Dist. LEXIS 169072, 33 (E.D. Cal. 2012) (taking "judicial notice of cases holding that measurements which are outside the benchmarks are conclusive evidence that the discharger is not in compliance with the BAT and BCT requirements of the EPA and the General Permit");  *Santa Monica BayKeeper v. SunLite Salvage,* slip op., Case No. Civ.99-4578 WDK (C.D. Cal. 1999), p. 3 (Davis Dec., Ex. G);  *Ecological Rights Foundation v. Sierra Pacific Industries*, slip op. No. C-01-0520 MEJ (N.D. Cal. 2002),  pp. 42-44) (Davis Dec., Ex. H).

liable for violations of the General Permit's receiving water limitations. *See, e.g. AG Indus. Mfg.*, 2005 U.S. Dist. LEXIS 43006, 6-7 (in case enforcing General Permit, court confirmed that "[t]he Clean Water Act is a strict liability statute. To establish a violation, a plaintiff need only prove that the terms and conditions of a defendant's NPDES permit (or, in California, the provisions of the State Order) were breached."); *see* 33 U.S.C. §§ 1311(a), 1342(k); *see also Wishtoyo Found. v. Magic Mt. LLC*, 2014 U.S. Dist. LEXIS 168311 (C.D. Cal. Dec. 3, 2014) (strict liability for violations by storm water pollutant discharges); *Puget Soundkeeper Alliance v. Tacoma Metals, Inc.*, 2008 U.S. Dist. LEXIS 60741 (W.D. Wash. Aug. 5, 2008) (holding in stormwater pollution violation case enforcing State of Washington's general permit that "[l]iability for a violation of the Clean Water Act is strict, *i.e.*, there is no 'de minimis' defense"); *Hawaii's Thousand Friends v. City and County of Honolulu*, 821 F. Supp. 1368, 1392 (D. Ha. 1993) ("courts throughout the country have held that NPDES compliance is a matter of strict liability and a defendant's intent and good faith are irrelevant").

Nor can Weber avoid the obvious fact that, as the Notice outlines, the applicable water quality standards set forth in both the CTR and the Basin Plan are numeric standards. Basin Plan, p. 7-159 (Weber RJN, Ex. 1);  65 Fed. Reg. 31752-31755 (Weber RJN, Ex. 2). The case law is clear that the General Permit does not contain any allowance for a mixing zone. *Kramer Metals*, 619 F.Supp.2d at 927 ("the CTR criteria apply 'end of the discharge pipe, unless the State authorizes a mixing zone.' 65 Fed. Reg. at 31701.  The General Permit authorizes no mixing zone");  *Int'l Metals Ekco, Ltd.*, 619 F.Supp.2d at 948;  *AG Indus. Mfg.*, 2005 U.S. Dist. LEXIS 43006, 24-25 ("[the General Permit] does not provide for a mixing zone").  As a result, whether a pollution discharge causes or contributes to a violation of one of the numeric water quality standards is measured where the discharge leaves a facility, unaffected by other discharges with which it may commingle. *AG Indus. Mfg.*, 2005 U.S. Dist. LEXIS 43006, 24-25 (rejecting facility's argument "that its water quality must be measured at the time storm water actually flows into a navigable water (as

opposed to the time it exits the AIM facility) is equally misplaced." *Id*. The General Permit provides a clear limitation that Weber's stormwater discharges not cause or contribute to violations of water quality standards and provides for measuring compliance at the facility's discharge locations. Davis Dec., Ex. A, General Permit, §(C)(2). None of Weber's efforts to argue the merits of the Second Cause of Action in order to try to attack CCAT's notice has merit.

**3.    CCAT's notice includes sufficient information to permit Weber to identify the activity alleged to constitute a violation of the General Permit's SWPPP requirements.**

Weber argues that CCAT's Third Cause of Action, alleging that the company's SWPPP fails to comply with the General Permit, should be dismissed because CCAT's notice fails to identify the specific provisions of the General Permit that are alleged to be violated. Weber Br., p. 13. Weber's argument is blatantly inaccurate, based on its excision of the operative text in CCAT's Notice. CCAT's Notice lists by section and description a long list of General Permit requirements about the content and uses of a SWPPP. Notice, p. 12. The Notice then states:

> CCAT's investigation of the conditions at the Facility as well as Weber Metals' Annual Reports and the SWPPP submitted to the Regional Board indicate that Weber Metals has been operating with an inadequately developed or implemented SWPPP *in violation of the requirements set forth above*.

*Id*. (emphasis added). The Notice also states, "Weber Metals has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary." *Id*. Likewise, the Notice's discussion of the SWPPP violations is also informed by the Notice's lengthy discussions that Weber has failed to implement BAT at its Facility. *See id*., pp. 4-10.

Weber's entire argument turns on its deletion of the highlighted language cited above. *See* Weber Br., p. 12 (deleting "in violation of the requirements set forth above" from the above quote). Likewise, Weber's assertion that "[t]he Notice failed to cite any specific paragraph or subparagraph that Weber is alleged to have violated within Section

A" is false and inaccurate. *Id.*, p. 14. Contrary to Weber's claim, the Notice carefully lists all conceivable shortcomings of the SWPPP – the polar opposite of the one sentence notice rejected in *Sierra Club Ohio Chapter v. City of Columbus*, 282 F.Supp.2d 756, 765 (S.D. Ohio 2003). Notice, p. 12. The plaintiff in *City of Columbus* only cited to general sections of the permit at issue without specifically identifying the numerous requirements embodied in each section. *See Sierra Club Ohio*, 282 F.Supp.2d at 765-68. No such criticism can be made against CCAT's notice. "Plaintiff's potential overinclusiveness does not mean that its notice is inadequate." *Levin Enters.*, 12 F.Supp.3d at 1227. Nor can CCAT's notice be distinguished from the sufficient notices addressed in *AG Indus. Mfg.*, 375 F.3d at 917 and *NRDC v. Southwest Marine*, 945 F.Supp. 1330, 1333 (S.D. Cal. 1996) as argued by Weber. Accordingly, the notice deficiencies alleged by Weber regarding the Third Cause of Action are fabricated and the motion to dismiss that claim should be rejected.

> **B. Weber's Argument that Factual Allegations in the Complaint Should be Stricken Because they were not Mimiced in the Notice is Incorrect Because Plaintiff's Notice is Sufficient.**

Weber's motion to strike all allegations in the Complaint that were not mentioned in the Notice is similarly without merit. There is no legal basis for the Court to strike factual allegations in the Complaint as "immaterial" or "impertinent" on the sole basis that they were not included in the Notice. As discussed at length above, Plaintiff's Notice gave Weber requisite notice of the allegations contained in the Complaint. The Notice lists specific standards and limitations that it alleges Weber to have violated, and describes the activities alleged to constitute these violations. *See supra*, pp. 8-12; *see also* Notice, pp. 4-13. The specific industrial activities that occur at the Facility, some of which are described in Plaintiff's Complaint, are not the activities constituting a violation of the CWA.[5] Therefore, they are not required to be included in the Notice Letter.

---

[5] None of the parties dispute that the Facility engages in industrial activities that trigger application of the Permit.

A plaintiff is not required to "list every aspect or detail of every alleged violation" in a notice letter. *AG Indus. Mfg.*, 375 F.3d at 917. A plaintiff is also not prohibited from listing additional details supporting alleged violations in a Complaint when those details were not known at the time a notice letter was issued. Nothing in the CWA prevents a Plaintiff from including allegations in a complaint that were not specifically mentioned in a notice letter. As long as the notice is adequate, a plaintiff is not prohibited from including additional factual allegations in the complaint.

In *San Francisco BayKeeper v. Tosco Corp.*, for example, the court held that a plaintiff could add additional dates of similar violations to its complaint following the notice letter, stating that "BayKeeper can pursue claims for violations on other dates within the overall period specified in the letter." 309 F.3d at 1159. The general notice given by BayKeeper of a range of a time period within which violations occurred supported its complaint that made more specific allegations about the dates on which violations occurred. Here, Weber was provided a robust notice of the violations that are now alleged in the Complaint. Weber is not precluded from providing more specific allegations in the complaint that fall within the general allegations made in the notice letter. *Id*.

Weber's argument about supposed new "theories" raised in Plaintiff's Complaint is without merit. Weber Br., p. 17. Rather than theories, Weber points to a number of allegations about conditions and practices at the Facility providing some underlying context for the sufficient allegations already raised in the Notice Letter and elsewhere in the Complaint. *Id.*, 16-17. The Court has jurisdiction over all of the allegations raised in the Complaint because the Notice Letter satisfies the requirements of Section 135.5(a) and because all allegations in the Complaint fall within the allegations made in the Notice Letter. The Court should therefore deny Weber's Motion to Strike.

//

//

//

1   **V.      CONCLUSION**

2          For the foregoing reasons, Defendant Weber's Motion to Dismiss and Motion to

3   Strike should be denied in its entirety.

4

5   Dated: April 13, 2015          Respectfully submitted,

6                                          LOZEAU DRURY LLP

7                                   By:    */s/ Michael R. Lozeau*
8                                          Michael Lozeau
9                                          Rebecca Davis
                                           Attorneys for Plaintiff
10                                         CALIFORNIA COMMUNITIES AGAINST
11                                         TOXICS

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28